[S. F. No. 19975.   In Bank.   Nov. 10, 1959.]

CAROLYN H. GARDNER et al., Respondents, v. STATE OF CALIFORNIA DIRECTOR OF EMPLOYMENT et al., Appellants.

Edmund G. Brown and Stanley Mosk, Attorneys General, Irving H. Perluss, Assistant Attorney General, William L. Shaw, Deputy Attorney General, Rea, Frasse, Anatasi, Clark & Chapman and Anthony J. Anastasi for Appellants.

Eddy S. Feldman as Amicus Curiae on behalf of Appellants.

Johnson, Thorne, Speed & Bamford and John E. Thorne for Respondents.

Charles P. Scully and Victor Van Bourg as Amici Curiae on behalf of Respondents.

SCHAUER, J.—This mandamus proceeding comes before us on appeal by defendant State of California and defendant employers from a judgment of the superior court ordering defendant state to pay petitioners unemployment insurance benefits. The judgment sets aside a decision of the California Unemployment Insurance Appeals Board which denied such benefits to the petitioners. We have concluded that defendants are correct in their contention that by reason of the provisions of section 1262 of the Unemployment Insurance Code[1] as heretofore construed and applied by this court petitioners are not, on the record before us, entitled to benefits, and that the judgment should be reversed.

Petitioners were members of two unions of restaurant employes which had established a committee called the Local Joint Executive Board to serve as their bargaining agent. The employers[2] were either members of the Santa Clara

---

[1]Section 1262 (formerly Unemployment Insurance Act, § 56): "An individual is not eligible for unemployment compensation benefits, and no such benefits shall be payable to him, if he left his work because of a trade dispute. Such individual shall remain ineligible for the period during which he continues out of work by reason of the fact that the trade dispute is still in active progress in the establishment in which he was employed."

[2]We are not concerned here with the employer San Remo Restaurant which was neither an active member of the association nor an authorizing employer. As to this employer, the appeals board held that its employe was entitled to unemployment insurance benefits.

County Restaurant Association or had given such association authority to negotiate labor matters for them. There were approximately 70 members of the association and 44 authorizing employers (hereinafter treated as members) in a total of 700 to 800 establishments. Lists of the association members had been sent to the board under dates of March 11, 1955, and April 28, 1955. Association members employed about 50 per cent (about 1,600 to 1,800 of the total of approximately 3,500) of all the employes in the industry in the county, including other help such as supervisorial, clerical, and office employes. Collective bargaining agreements had been negotiated by and executed between the board and the association from 1951 through 1955, during which time the board had recognized the association as the bargaining agent for association members and the association had likewise recognized the board as bargaining agent for the employes of association members.

On April 11, 1955, following negotiations on modification of a 1953 master contract,[3] the unions voted to strike *against the entire industry,* and the board was authorized to determine when and against whom to call and implement the authorized strike. This action by the unions marked the inception of a trade dispute and was the forerunner of typical collective bargaining maneuvers, collective for all the member employes through their Local Joint Executive Board and for all the member employers through their county association. It was the intent of the union in seeking to secure a more desirable master contract to use the strategy of implementing the strike against, and picketing, selected association members rather than undertaking to walk out of, and picket, all at the same time. Two weeks later (April 25) association members voted to adhere to the previously adopted policy that a strike implemented against one would be recognized as a strike directed against all, and on April 28 notified the board of this decision. The unions were of course aware that the trade dispute concerned the terms of their master contract, that they had voted a strike against, and were seeking a better contract with, all association members, and they were specifically notified that a strike implemented by them against *any* association member would, or at least could, result in a retaliatory shutdown or

---

[3]This contract had covered the period from July 1, 1953, to April 30, 1956, and had provided that the anniversary date would be April 30 of each year and that, on the second anniversary date, it might be opened on the issues of wages and fringe benefits.

lockout by other association members.[4] It is clear that at this time a trade dispute was in progress but until this time no economic weapon had actually been applied by either party.

But on May 25, 1955, the first blow was struck; the board, seeking to enforce its previously announced demands for changes in the master contract affecting all employers and all employes, called and implemented the authorized strike against, and picketed, the establishments of nine or 10 association members. On the same day the association, pursuant to its previously announced policy, retaliated by notifying its members to lay off their employes as of the close of business the following day, because of the strike. The evidence conflicts as to the effectiveness of the shutdown. There is testimony that the lockout was 70 per cent effective as to total number of employes affected, and also that only some 34 or 35 members (with an unspecified number of establishments) had effected complete lockouts. On June 13, 1955, the lockout was terminated by the association because it was not complete and had caused dissension among the members. Some of the members allegedly signed individual contracts, but negotiations between the board and association were continued and on June 29, 1955, an agreement was executed by the executive board and by the association. Such master agreement covered the association members who had allegedly signed individual contracts as well as the others, and the dispute between the unions and the association thereupon terminated.

■ Petitioners were union member employes of restaurants which closed in response to the association's notice. The Unemployment Insurance Appeals Board determined that under the volitional test rule as enunciated, developed and applied in *Bodinson Mfg. Co.* v. *California Emp. Com.* (1941), 17 Cal. 2d 321, 327 [109 P.2d 935]; *Bunny's Waffle Shop* v. *California Emp. Com.* (1944), 24 Cal.2d 735, 738, 742 [151 P.2d 224]; *McKinley* v. *California Emp. Stab. Com.* (1949), 34 Cal.2d 239, 244-245 [209 P.2d 602]; and *Chrysler Corp.* v. *California Emp. Stab. Com.* (1953), 116 Cal.App.2d 8, 15-20 [3-7] [253 P.2d 68] (see also *Barber* v. *California Emp. Stab. Com.* (1954), 130 Cal.App.2d 7, 16-20 [278 P.2d 762]), petitioners

[4]Evidence on the following proposition was in considerable conflict: In 1953 despite a similar notice that a strike against one would be considered a strike against all, the board had called a strike against some association members, which proceeded for six weeks before the association had called for a lockout by nonstruck members. The strike ended the day after the lockout began; the dispute had been settled with a new collective bargaining agreement. The number or percentage of nonstruck members who had honored the lockout request was not established.

had left their work because of a trade dispute and hence, under section 1262 of the Unemployment Insurance Code,[1] were ineligible for benefits.

This determination is correct unless we are to overrule the McKinley case and overrule, disapprove or distinguish the other cited cases. Here as in McKinley, the unions had voted to strike against the entire industry and the executive board was authorized (in the language of the appeals board's decision) "to call a strike if and when and against whom it determined to be to the best advantage of the union"; the objective sought to be accomplished by the strike was the making of certain changes in the master collective bargaining agreement, which changes would affect all association members and their employes; furthermore, as in McKinley, the unions were aware of the policy of the employers, acting through their association, that a called strike against one would be considered a strike against all.[5] Obviously here, as in McKinley, the unions could foresee that the strategy of implementing the strike against less than all members might result in termination of the employment of employes of the other members, and that their consequent unemployment would, under the currently established rule, be regarded as voluntary and thus a bar to benefits. As in *Thomas* v. *California Emp. Stab. Com.* (1952), 39 Cal.2d 501, 504-506 [5, 6] [247 P.2d 561], the only reasonable conclusion consistent with the volitional theory, as it is accepted and applied in this state, is that the claimants were out of work after the lockout because of their own conduct and that of their authorized unions.

Petitioners urge that we overrule the volitional test, at least as applied in McKinley, or else undertake to distinguish the present case in order to permit payment of benefits. We recognize that the McKinley decision was by a divided court. The majority (four of the justices) concurred in analyzing the Bunny's Waffle Shop decision as follows (34 Cal.2d 239, 243-244): "[C]ertain restaurant owners sought to compel

---

[1] See footnote 1, *supra*, p. 24.

[5] According to the decision of the appeals board, "As a result of . . . notice and discussions had with the association's members and committees, the union was aware that a lockout could result in case of a strike; but it did not believe that such result would follow. The executive board viewed the notice of the association as a threat which might be tried but which would be ineffective. . . . In our opinion, the facts are such as to render all of the claimants except [an employe of a restaurant not a member of the association] . . . ineligible for benefits within the rule of *McKinley* v. *California Employment Stabilization Commission* (1949), 34 Cal.2d 239 [209 P.2d 602]."

their employees, through their union, to deal with a newly organized San Francisco Employers' Council in obtaining a collective bargaining agreement. The union refused to bargain except with the individual employers as had been the custom. To compel joint negotiations, the restaurant owners made a reduction of 25 per cent in wages, and a six-day week with split shifts was established instead of the existing five-day week and straight shift. When the employees were paid at the lower rate, they left their jobs. . . .

''The commission contended that, in effect, the employers' action constituted a lockout. This position was upheld because the court determined, after reviewing the employers' acts, that they were disassociated from any bona fide proposal in connection with the dispute, hence, 'when claimants left their work, they left because of this economic weapon and not because of the trade dispute then in existence.' In reaching its conclusion, the court recognized that, in reality, the form of the cessation of employment is not controlling and the determinative factor is the volitional cause of the work stoppage. In other words, although the employees left work of their own choice, that choice was not freely made but was compelled by the economic weapon which the employers used. This is the only sound and fair way to apply the subjective volitional test stated in *Bodinson Mfg. Co.* v. *California Emp. Com.*, 17 Cal.2d 321 [109 P.2d 935].

''Applying this rule to the issue in the present case, the stipulated facts clearly show that the employees of the Sacramento bakeries left their work voluntarily and, therefore, should have been excluded from receiving unemployment benefits. Continuously since 1935, the union and the association, by collective bargaining, had entered into one master contract which included all of the employers and the employees of the baking industry of Sacramento. It seems clear that under such industry-wide, single contract negotiation, economic action by either side, whether strike or lockout, would be considered by each of the parties as action against the entire group struck or locked out. However, for the purpose of furthering the demand for certain amendments to that contract, the members of the union, by group action, voted to strike. The selection of a certain plant or plants for a shutdown by strike at a particular time was a mere matter of strategy in the conduct of the trade dispute which equally involved all of the bakeries and their employees. This, in effect, applied the union's economic sanctions against

each employer and brought about the unemployment of all of its members. Had the association acted first by closing down one of the member plants and the union followed with a strike against all of the remaining plants, it would be equally clear that the volitional act causing unemployment was the initial shutdown.''

We recognize also that in McKinley three justices dissented (pp. 252-263 of 34 Cal.2d), being of the view that the volitional test was not properly applicable in the circumstances of that case. We emphasize, however, that the division of opinion was not on the basic rule of law itself but was solely as to its applicability as a matter of law to the facts there presented. The majority determined that ''the only sound and fair way to apply the subjective volitional test stated in Bodinson'' (pp. 243-244) was to enforce it in the circumstances there shown (where there was a trade dispute between parties to a master collective bargaining contract, each acting through authorized representatives) against the party who strikes the first blow with the drastic economic weapon of strike or lockout. As has hereinabove been shown, the circumstances here, for all purposes material to the rule of law, are substantially the same or similar to those in McKinley. The equal applicability of the rule therefore, regardless of whether the first blow be struck by employers or by employes, is now as much a part of the rule as is the first enunciation of it in Bodinson or its development and application in Bunny's Waffle Shop.

It is of some significance that the Legislature has not seen fit to alter section 1262 since decision of the above cited cases although in various other respects the Unemployment Insurance Code has been amended. (*Cole* v. *Rush* (1955), 45 Cal.2d 345, 355 [8, 9] [289 P.2d 450, 54 A.L.R.2d 1137]; *State* v. *Industrial Acc. Com.* (1957), 48 Cal.2d 355, 364 [7] [310 P.2d 1].) It also bears mention in connection with the question as to whether we shall depart from or adhere to our present rule governing construction and application of the volitional test that the following out of state cases have cited, followed, and relied upon McKinley, Bunny's Waffle Shop, or Bodinson, or upon the volitional test principles expressed in those cases: *Depaoli* v. *Ernst* (1957), 73 Nev. 79 [309 P.2d 363, 365-367]; *Teamsters, Chauffeurs, etc. Brotherhood* v. *Orange Transp. Co.* (1956), 5 Utah 2d 45 [296 P.2d 291, 294]; *Olof Nelson Const. Co.* v. *Industrial Commission* (1952), 121 Utah 525 [243 P.2d 951, 956-959]; *Lexes* v. *Industrial Com-*

*mission* (1952), 121 Utah 551 [243 P.2d 964, 966-969];
*Schoenwiesner* v. *Board of Review* (1957), 44 N.J.Super. 377
[130 A.2d 648]; *Climax Fire Brick Co.* v. *Unemployment
Comp. Board of Review* (1950), 166 Pa.Super. 481 [72 A.2d
300, 302]; *Amory Worsted Mills* v. *Riley* (1950), 96 N.H. 162
[71 A.2d 788, 790-791]); see also *Ackerlund* v. *Employment
Security Department* (1956), 49 Wn.2d 292 [300 P.2d 1019];
*Mountain States Tel. & Tel. Co.* v. *Sakrison* (1950), 71 Ariz.
219 [225 P.2d 707].

As applied in the subject and cited cases the rule works
impartially as to both employes and employers and puts each
group on notice that the one which creates and first applies
the economic weapon in a trade dispute under circumstances
such as those present in Bunny's Waffle Shop, or McKinley
or here, may have to bear responsibility for foreseeable re-
prisals.

. We conclude that in the interest of stability of the law
any change of substance of the rule, or of circumstances for
its applicability, should come from the Legislature rather than
from reconsideration by this court.

The judgment of the superior court is reversed except as
to benefits ordered to be paid to petitioner Joan Northcutt,
who was the employe of San Remo Restaurant,[2] which was
neither an active member of the association nor an authorizing
employer, and as to such benefits it is affirmed.

Spence, J., McComb, J., and White, J., concurred.

Gibson, C. J., concurred in the judgment.

TRAYNOR, J., Concurring.—For the reasons set forth in
the dissenting opinion of Chief Justice Gibson in *McKinley*
v. *California Emp. Stab. Com.*, 34 Cal.2d 239, 252 [209 P.2d
602], it is my opinion that petitioners did not voluntarily
leave their work because of a trade dispute. (Unempl. Ins.
Code, § 1262.) Since a majority of the court, however, is
unwilling to overrule the McKinley case, I concur in the
judgment under the compulsion of that case.

PETERS, J.—I dissent.

The majority of this court, by judicially amending section
1262 of the Unemployment Insurance Code,[1] have denied to

---

[2]See footnote 2, *supra*, p. 24.
[1]Formerly section 56 of the Unemployment Insurance Act.

employees who want to work and are desirous of doing so but who are locked out of their employment by their employers, the benefits of unemployment insurance conferred upon them by the statute. This is done by simply holding, contrary to the fact, and contrary to the realities of the situation, that employees "voluntarily" leave their work when a strike is called by the union against several employers, and other employers, not struck, close their plants pursuant to an agreement among the employers that a "strike against one is a strike against all." Thus, employees who are willing to work and who are not on strike are prevented from collecting unemployment insurance by a unilateral agreement between employers to which the employees are not parties. The employers may, of course, legally enter into such an agreement, but to hold that, in such event, the employees of the non-struck plants left their work "voluntarily," and were not the victims of a "lock out" is to disregard the ordinary, plain and proper meaning of these two terms. It is judicial legislation of the most obvious type.

This result is reached on the authority of *McKinley* v. *California Emp. Stab. Com.*, 34 Cal.2d 239 [209 P.2d 602]. It is true that in that case the four justices then constituting a majority of this court so interpreted the statute. This interpretation was just as wrong then as it is now. This was clearly pointed out in the dissents of Chief Justice Gibson (34 Cal.2d at p. 252)[2] and of Justice Carter (34 Cal.2d 263).

We are now told by the majority that, because four members of this court reached this result in *McKinley*, we should not reappraise that result because to do so will interfere with the "certainty" of the law. "Certainty" in the law is a desirable concept, but it is not the only principle that should govern appellate action. I certainly agree that, once this court has decided an issue, even if it be by a bare majority, the decision thus reached should be followed in subsequent cases unless there are compelling reasons why it should not. It is undeniably true that every decision of the court should not be reconsidered simply because of a change of personnel in the court. *Stare decisis* is an important doctrine. But it is equally true that it is not the function of a Supreme Court justice to sit back in every case and automatically perpetuate the errors of his predecessors simply because those errors were once approved. Where a prior decision is clearly

---

[2] In which dissent Justice Traynor joined.

wrong, where it has done a great injustice to a large segment of our population, and where an important issue is at stake a judge should not hesitate to reevaluate, to reconsider, and, if necessary, to overrule prior decisions.

This is such a case. This court adopted and properly applied the so-called volitional test in interpreting section 1256 of the Insurance Code in *Bodinson Mfg. Co.* v. *California Emp. Com.*, 17 Cal.2d 321 [109 P.2d 935], and in *Bunny's Waffle Shop* v. *California Emp. Com.*, 24 Cal.2d 735 [151 P.2d 224]. These holdings were misinterpreted and misapplied in the McKinley case. That misinterpretation and misapplication of the statute is being perpetuated by the majority opinion in the present case.

The proper interpretation and application of the statute were clearly and correctly pointed out by Chief Justice Gibson and by Justice Carter in their dissents in the McKinley case. I can add nothing material to what is there said. I base my dissent on the views there expressed. Suffice it to say that if the majority are correct they have placed in the hands of the employers the means of denying unemployment benefits to a large segment of labor. If the majority are correct, an over-all employers' asociation in any particular area can simply adopt by unilateral action a policy that a ''strike against one is a strike against all.'' Then if a strike is called against one, and there is a general lockout, all labor thus locked out will be deprived of the benefits of a statute passed for their benefit. This is not what the act provides or intends.

I would affirm the decision of the trial court.

Respondents' petition for a rehearing was denied December 10, 1959. Peters, J., was of the opinion that the petition should be granted.